UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| A.I., a minor, by her parents and next friends, Rosemary & Michael Iapalucci, <br><br> and <br><br> ROSEMARY & MICHAEL IAPALUCCI, <br><br> Plaintiffs, <br><br> v. <br><br> DISTRICT OF COLUMBIA, <br><br> and <br><br> ROBERT C. RICE, in his official capacity as Interim Superintendent of the District of Columbia Public Schools, <br><br> Defendants. | Civil Action No. 04-828 (CKK) |

**MEMORANDUM OPINION**
(September 19, 2005)

Plaintiffs Rosemary and Michael Iapalucci, on behalf of their minor daughter, A.I., and in their own right, brought this action under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400 *et. seq.*, against Defendants, the District of Columbia and Robert C. Rice, in his official capacity as Interim Superintendent of the District of Columbia Public Schools. The IDEA provides that all children with disabilities will be provided a free and appropriate public education ("FAPE"), and provides for procedural safeguards to ensure that disabled children receive individualized education programs ("IEP") to fulfill the Act's goals. This case comes to the Court on appeal from the April 21, 2004 Hearing Officer Determination

("H.O.D.") and related proceedings.

Currently before the Court are Plaintiffs' Motion for Summary Judgment ("Pls.' Summ. J."), Defendants' Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Opp'n"), Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Summary Judgment (Pls.' Reply), Defendants' Motion for Summary Judgment ("Defs.' Summ. J."), Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Pls.' Opp'n") and Defendants' Reply to Plaintiffs' Opposition to Defendants' Motion for Summary Judgment ("Defs.' Reply"). Upon a searching examination of the present filings, the relevant case law, and the entire record herein, the Court shall deny Plaintiffs' Motion for Summary Judgment and shall grant Defendants' Motion for Summary Judgment.

## I: BACKGROUND

A.I. is thirteen-year old child[1] who has been coded by the District of Columbia Public Schools (DCPS) with "Multiple Disabilities," which includes a Speech-Language Impairment, a Learning Disability, and an Other Health Impairment, and has been found to be in need of special education. Compl. ¶ 7; Plaintiffs' Statement of Undisputed Facts ("Pls.' Facts") ¶ 4. A.I. was adopted by Rosemary and Michael Iapalucci when she five years and nine months old from an orphanage in Kazakhstan. Compl. ¶ 6; Pls.' Facts ¶ 2; R. at 56. Upon adoption, the Iapaluccis enrolled A.I. in pre-Kindergarten at Janney Elementary School ("Janney"), their neighborhood elementary school in the District of Columbia. 4/2/2004 Tr. at 179. Because A.I. was almost six-years old at this time, pre-Kindergarten was a year behind her grade level. *Id.* Mrs. Iapalucci

---

[1] A.I. was born on January 24, 1992, R. at 4, and was twelve-years old when the Complaint was filed on May 2, 2004. Compl. ¶ 6.

testified that upon enrollment she and Mr. Iapalucci immediately requested speech therapy. *Id.* When none was provided by the school, they obtained outside therapy at their own cost. *Id.* At the end of A.I.'s Kindergarten year, her teacher recommended more testing. *Id.* In response to this recommendation, Gabrielle Grunau, a DCPS School Psychologist, conducted a psychological evaluation of A.I. on May 19, 1999, and determined that "[a]t this time, [A.I.] does not meet the criteria as a Learning Disabled student, and therefore, is not considered multiply handicapped. She is Speech Impaired." Pls' Summ. J., Ex.. 1 at 6. The Iapaluccis again requested testing when A.I. was in second grade because she continued to have difficulties in the classroom. Pls.' Summ. J. at 6; 4/2/2004 Tr. at 179.

Concerned about the level of difficulty A.I. was having completing her homework, the Iapaluccis sought an outside neuropsychological evaluation by Dr. Patricia Papero when A.I. was in fourth grade. 4/2/2004 Tr. at 179; R. at 56. Dr. Papero observed and tested A.I. on three occasions from October 25, 2002 through October 31, 2002. R. at 56. Dr. Papero concluded that A.I. should be classified by the DCPS as having an Other Health Impairment, a Learning Disability, and Speech/Language Disorder. R. at 69. Furthermore, Dr. Papero suggested that "[m]ore intensive intervention must be put in place as possible in order for [A.I.] to have a chance of making a better rate of progress" and recommended that the Iapaluccis consider placing A.I. in a "self-contained language-based learning program." R. at 70. She also recommended that the Iapaluccis seek a comprehensive speech/language evaluation. R. at 72.

On December 12, 2002, the Iapaluccis had A.I. evaluated by Lisa Washington, a speech pathologist with the University of the District of Columbia. R. at 45. Ms. Washington agreed with Dr. Papero's conclusion that A.I. would benefit from "an educational program that could

3

more fully integrate language and learning strategies into the classroom curriculum."  R. at 50;

Defs.' Statement of Material Facts as to Which There is No Dispute ("Defs.' Facts") ¶ 4(3).[2]

H.O.D. at 6–7, R. at 101.

The Iapaluccis subsequently provided both Ms. Washington's and Dr. Papero's reports to

the DCPS.  On January 24, 2003, Dr. Belton Wilder – a clinical psychologist contracted by the

DCPS – conducted a review of Dr. Papero's evaluation.  R. at 51.  In large part, Dr. Wilder's

conclusions did not differ from those of Dr. Papero, and Dr. Wilder agreed that A.I. would

require educational accommodations for her weaknesses.  R. at 54.  During this same time

period, on January 17, 2003, the DCPS conducted an occupational therapy ("OT") evaluation of

A.I., wherein the therapist, Amanda Farber, OTR/L, found that A.I. "demonstrates average visual

motor skills and very strong visual perceptual skills.  She demonstrates decreased speed when

performing fine motor coordination and manipulation skills although she has fair accuracy when

provided increased time."  R. at 196.  The OT evaluation concluded that A.I. did not require

special education OT services, but did recommend: (1) that A.I. be provided a pencil grip to

"improve comfort and pressure of grasp," (2) participation in extracurricular activities to improve

balance and gross motor skills, (3) visual aids "to enhance learning secondary to her strong visual

perceptual and visual memory skills," and (4) additional time to complete tasks with fine motor

---

[2]  It should be noted that the Defendants' Statement of Material Facts as to Which There is No Dispute consists largely of rote incorporation of the Hearing Officer's Findings of Facts and Conclusions of Law.  Furthermore, while the Plaintiffs do not challenge the Defendants' Statement of Material Facts insofar as it shows that the Hearing Officer made Findings of Fact and Conclusions of Law, they do object to the rote reproduction of the Findings of Facts and Conclusions of Law into the Defendants' Statement of Material Facts.  Plaintiffs also object specifically to ¶¶ 6 and 8 of the Hearing Officers Findings of Fact and to the inclusion of the Conclusions of Law in Defendants' Statement of Material Facts.  *See* Pls' Response to Defs.' Statement of Material Fact ¶¶ 4, 5.

components.  R. at 197-97.

As a result of the testing, DCPS convened a Multidisciplinary Team ("MDT")/IEP meeting on March 18, 2003, in order to develop a strategy to cope with A.I.'s disabilities.  Pls.' Summ. J. at 8; R. at 147.  While they attended and participated in the meeting, the Iapaluccis were ultimately dissatisfied with the number of hours of special education recommended in the resulting IEP – approximately 9.5 hours/week[3] – and refused to signed the IEP.  Compl. ¶ 15, 4/2/2004 Tr. at 182.  According to the Iapaluccis, the IEP also failed (1) to include A.I.'s present levels of educational performance in the classroom, (2) identify appropriate goals and objectives by not specifying the goals and objectives that she had not previously mastered, (3) address her OT-based needs, (4) list any classroom accommodations, and (5) place her in a situation where she was provided a low student-teacher ratio for large periods of time.  *See* Pls.' Facts ¶¶ 19-22. Despite these objections, A.I. received these services provided for in her IEP for the remainder of the 2002-2003 school year at Janney.  4/2/2004 Tr. at 140; Pls.' Summ. J. at 9.

On June 11, 2003, a MDT/IEP meeting was held in order to review A.I.'s IEP, to examine her progress, and to discuss A.I.'s IEP for the 2003–2004 school year.  The Iapaluccis once again attended and expressed their concern that the proposed IEP would not provide A.I. with enough support for her to make progress.  R. at 202.  It was their impression, based on the recommendations of the experts, that A.I. should be receiving more of her education in a special education setting, rather than in a regular classroom setting.  R. at 203.  The minutes of the IEP

---

[3] Specifically, the IEP provided A.I. with three (3) hours per week of "Specialized Instruction" within the general classroom of twenty-three students, five (5) hours per week of "Specialized Instruction" removed from the general classroom, and one-and-one-half (1.5) hours per week of "Speech Language Therapy" services, also removed from the general classroom. Pls.' Facts ¶ 16.

meeting reflect that the Iapaluccis agreed with the goals of the IEP but rejected (1) the level of service being offered and (2) Janney Elementary School ("Janney") as a placement for A.I. Furthermore, they opined that certain goals should have been included in the IEP but wrongly were omitted. R. at 203. Despite these concerns, the IEP team concluded that mainstreaming A.I. would have educational benefit and declined to modify the IEP to provide her with more time out of the classroom in special education.[4] R. at 209. On June 24, 2003, the Iapaluccis informed Janney that they had decided to enroll A.I. in "a non-public special education setting" and that "[t]hey do not believe that [A.I.] would be expected to make meaningful educational progress in the program and placement proposed through the recent IEP process." R. at 76. The Iapaluccis settled on Kingsbury Day School ("Kingsbury"), a private school in Washington, D.C., that offers special education services for children with language disorders, learning disabilities, and social/emotional disorders, and enrolled A.I. in school there for the 2003-2004 school year. Compl. 16-17; R. at 76. By all accounts, A.I. has been successful in this placement, wherein she is enrolled in a class of ten students, as opposed to twenty-five, and can now complete her homework independently. R. at 103 (H.O.D.); Pls. Summ. J. at 10; 4/2/2004 Tr. at 139, 154, 183.

On November 4, 2003, the Iapaluccis attended an IEP meeting at Kingsbury intended to develop a new IEP for A.I. for the 2003-2004 school year there. R. at 94. The IEP that was developed by Kingsbury included one-hour and fifteen-minutes of speech and language therapy each week. R. at 77. The IEP noted that A.I. needed small group instruction and one-on-one

---

[4] The Record does not include a proposed IEP from the June 11, 2003 meeting, although the H.O.D. found that the resulting IEP for 2003-2004 was the same as the 2002-2003 IEP. R. at 103 (H.O.D.).

support and that putting her in the least restrictive placement "will result in loss of self esteem as

[a] competent learner."  R. at 93.  The IEP developed by Kingsbury placed A.I. at Kingsbury for

the 2003-2004 school year, R. at 93, and Mr. Iapalucci signed the IEP indicating that he, as A.I.'s

parent, agreed with the IEP.  R. at 77.  On November 13, 2003, the Iapaluccis filed a request with

the DCPS for a due process hearing seeking funding and placement at Kingsbury and alleging

that "DCPS failed to develop an appropriate IEP [and] placement for [A.I.]."  R. at 6.

The hearing was scheduled for December 12, 2003, and was presided over by Terry

Michael Banks, an independent hearing officer.  Pls.' Facts ¶ 30.  Due to the number of witnesses

and the late hearing time, the hearing had to be continued to a date agreed upon by both counsel

for Plaintiffs and Defendants.  12/12/03 Tr. at 115-16.  On February 17, 2004, Plaintiffs' counsel

requested the Student Hearing Office to set a date for reconvening the hearing, stating that as of

February 17, 2004, there had been no date proposed to him for a hearing.  R. at 114.  On March

11, 2004, the Student Hearing Office informed counsel for both parties that a date had been set to

reconvene on March 26, 2004.  R. at 142.  Plaintiffs' counsel requested a continuance and

Hearing Officer Banks granted the unopposed motion and set the hearing for April 2, 2004.  R. at

109-11.  At the April 2, 2004 hearing, Hearing Officer Banks denied Plaintiffs' motion for relief

based upon failure to conform to the 45-day procedural time limit required by 34 C.F.R §

300.511(a) on conducting due process hearings and rendering a final decision on the due process

petition because he found "[t]here has been no effort between counsel to set a date" despite their

agreement to do so at the December 12, 2003 hearing.  4/2/2004 Tr. at 17.

In the April 21, 2004 H.O.D. resulting from the December 12, 2003 and April 2, 2004

hearings, Hearing Officer Banks concluded that DCPS had met its burden of proving the IEP for

placement at Janney was appropriate for A.I..  R. at 103 (H.O.D.).  The decision of the IEP Team

for A.I. to receive her education principally in the regular classroom was determined to be

reasonable in light of testimony by A.I.'s teachers that she was benefitting from interacting with

children who were not disabled.  R. at 104 (H.O.D.).  Hearing Officer Banks further concluded

that while the testimony of Mrs. Iapalucci regarding the progress A.I. made at Kingsbury was

credible, DCPS had "provided [A.I.] with the education benefit as required by IDEA."  R. at 105

(H.O.D.).  According to Hearing Officer Banks, "DCPS is obligated only to provide educational

benefit to [A.I.], not maximize her educational experience."  *Id.*

In contesting the H.O.D., Plaintiffs' Complaint alleges three central claims.  Compl. ¶¶

49–59.  First, Plaintiffs charge that Defendants failed to provide A.I. with a free appropriate

public education and due process of law.  Second, Plaintiffs charge that Defendants failed to

place and fund A.I. at Kingsbury for the 2003-2004 school year.  Third, Plaintiffs charge that

Hearing Officer Banks erroneously denied reimbursement of the Kingsbury tuition costs to the

Iapaluccis.  Defendants, in addition to contesting the claims made by Plaintiffs, contend in

response: (1) Plaintiffs are not entitled to private school tuition reimbursement where a public

school was appropriate, and where the parents were given a chance to have their objections to the

IEP heard; (2) the Iapalucci's failure to cooperate with the DCPS ensured that they forfeited any

right to reimbursement; (3) the parents' failure to provide notice that would permit the IEP team

to address their concerns with Janney nullified their right to reimbursement for private school

tuition; and (4) Plaintiffs' interest in a private school placement should have been expressed at

the MDT/IEP meeting before the unilateral withdrawal of A.I from Janney.  *See* Defs.' Summ. J.

at 18-25.

## II: STATUTORY FRAMEWORK

The purpose of the IDEA is "to ensure that all children with disabilities have available to

them a free appropriate public education ["FAPE"] that emphasizes special education and related

services designed to meet their unique needs . . . ." 20 U.S.C. § 1400(d)(1)(A).  "Implicit" in the

IDEA's guarantee "is the requirement that the education to which access is provided be sufficient

to confer some educational benefit upon the handicapped child."  *Bd. of Educ. of Hendrick*

*Hudson Cent. Sch. Dist., Westchester County v. Rowley*, 458 U.S. 176, 200, 102 S.Ct. 3034, 73

L.Ed.2d 690 (1982) ("*Rowley*").

As a condition of funding under the IDEA, the Act requires school districts to adopt

procedures to ensure appropriate educational placement of disabled students.  *See* 20 U.S.C.

§ 1413.  School districts must also develop comprehensive plans for meeting the special

educational needs of disabled students.  *See* 20 U.S.C. § 1414(d)(2)(A).  These plans, known as

individualized education plans, or IEPs, must

> include a written statement of evaluation and plan of action that sets forth the
> child's present level of educational performance, measurable goals, including
> benchmarks or short-term objectives, special education and related services to be
> provided to the child and program modifications or supports for school personnel
> that will be provided to the child, the child's ability to interact with non-disabled
> children, a statement of administrative modification, the projected date for the
> beginning of services, and the anticipated frequency, location and duration of
> those services, and how the child's progress toward the annual goals will be
> measured.

*Diatta v. Dist. of Columbia*, 319 F. Supp. 2d 57, 66 (D.D.C. 2004) (citing 20 U.S.C. §

1414(d)(1)(A)(i)-(vi), (viii)).

A student's eligibility for a FAPE under the IDEA is determined by the results of testing

and evaluating the student, and the findings of a "multidisciplinary team" and/or "individualized

educational plan team" ("MDT/IEP team").  Such a team consists of the disabled student's

parents, teachers, and other educational specialists, who meet and confer in a collaborative

process to determine how best to accommodate the needs of the students to provide a FAPE.  *See*

20 U.S.C. § 1414(d)(1)(B) (outlining the membership of the IEP team).  The federal regulations

interpreting the IDEA require that a meeting to develop an IEP be held within thirty (30) days of

the determination of a child's need for special education and related services.  34 C.F.R.

§ 300.343(b)(2).[5]  The District of Columbia's regulations follow suit.  D.C. Mun. Regs. tit. 5 §

3007.1.

The IDEA also guarantees parents of disabled children the opportunity to participate in

the evaluation and placement process.  *See* 20 U.S.C. § 1414(f) (allowing for alternative means

of participating in meetings, such as tele- or video-conferencing), 1415(b)(1) (ensuring that the

parents have the opportunity to participate fully in the process by providing access to records

relating to the child and allowing for  independent evaluations of the child).  "The IEP team shall

conduct an initial evaluation of a child within a reasonable time of receiving a written referral

and parental consent to proceed within timeliness consistent with Federal law and D.C. Code

§ 38-2501(a)."  D.C. Mun. Regs. tit. 5, § 3005.2.  The regulations require DCPS to use "a variety

of assessment tools and strategies" to gather "relevant functional and developmental information

about the child."  *Id.* § 3005.9(b).  Parents who object to their child's "identification, evaluation,

---

[5] On November 13, 2003, the District of Columbia amended the statute that required
DCPS to assess and evaluate a student who may have a disability and who may require special
education services, changing the amount of time allotted for completion of the evaluation from
sixty (60) days to one hundred and twenty (120) days.  *See* D.C. Code § 38-2501.  The amended
statute allots one hundred and twenty (120) days within learning of a child's disability to locate
an appropriate placement.  *Id.* §§ 38-2501(a) & (b).

or educational placement" are entitled to an impartial due process hearing, *see* 20 U.S.C.

§§ 1415(b)(6)(A) (permitting the filing of a complaint by objecting parents), (f)(1)(A) (providing

parents who file a complaint under § 1415(b)(6) with the opportunity to have an impartial due

process hearing), at which they have a "right to be accompanied and advised by counsel." 20

U.S.C. § 1415(h)(1). A qualified impartial Hearing Officer conducts the due process hearing in

accordance with the Act. D.C. Mun. Regs. tit. 5, § 3030.1. Under the IDEA, a party who is a

parent of the disabled child is entitled to attorney's fees and costs if he or she is a "prevailing

party." 20 U.S.C. § 1415(i)(3)(B). To be the prevailing party, the parent(s) must gain a "material

alteration of the legal relationship of the parties" and gain judgment on the merits. *Bridgeforth v.*

*Dist. of Columbia*, 933 F. Supp. 7, 10 (D.D.C. 1996).

Parents "aggrieved by" a Hearing Officer's findings and decision may bring a civil action

in either state or federal court. 20 U.S.C. § 1415(i)(2); D.C. Mun. Regs. tit. 5, § 3031.5. The

district court has remedial authority under the Act, and broad discretion to grant "such relief as

the court determines is appropriate" under the IDEA as guided by the goals of the Act. 20 U.S.C.

§ 1415(i)(2)(B)(iii).

### III: LEGAL STANDARDS

*A.    Summary Judgment*

In this case the Court is presented with cross motions for summary judgment. A party is

entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there

is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as

a matter of law. *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).

Under the summary judgment standard, Defendant, as the moving party, bears the "initial

responsibility of informing the district court of the basis for [its] motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own

affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific

facts showing that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law").  "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.

Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

B.  *The IDEA*

1.  Legal Standard

The IDEA permits "any party aggrieved by the findings and decision" rendered during administrative proceedings to "bring a civil action" in state or federal court without regard to the amount in controversy.  20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.512(b)(3).  The reviewing court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C); 34 C.F.R. § 300.512(b)(3).  In a review of an H.O.D., the burden of proof is always on the party challenging the administrative determination, who must "at least take on the burden of persuading the court that the Hearing Officer was wrong, and that a court upsetting the officer's decision must at least explain its basis for doing so."  *Reid v. Dist. of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1988) ("*Kerkam I*")).  Little deference, however, is due those hearing decisions which lack "reasoned and specific findings." *Id.* (quoting *Kerkum v. Superintendent, D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991) "*Kerkum II*")).

The Supreme Court has interpreted the "preponderance standard of review not to be an allowance of unfettered *de novo* review." *Dist. of Columbia v. Ramirez*, 377 F. Supp. 2d 63, 67 (D.D.C. 2005) (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034).  Courts must give administrative proceedings "due weight," and "[f]actual findings from the administrative proceedings are to be considered prima facie correct."  *Id.*  (quoting *S.H. v. State-Operated Sch. Dist. of the City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003)).  Courts may not substitute their own views for those of the Hearing Officer, *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034; *Shaw v. Dist. of Columbia*, 238 F. Supp. 2d 127, 134 (D.D.C. 2002), and a court upsetting a Hearing Officer's decision "must at least explain its basis for doing so."  *Ramirez*, 377 F. Supp. 2d at 67 (quoting *Kerkam I*, 862 F.2d at 887).  However, the statute also suggests "less deference than is conventional in administrative proceedings," *Reid*, 401 F.3d at 521, since the district court is allowed to hear additional evidence at the request of the party.  20 U.S.C. § 1415(i)(2)(C)(ii).  "When no additional evidence is introduced in a civil suit seeking review of an H.O.D., a motion for summary judgment operates as a motion for judgment based on the evidence comprising the record."  *Ramirez*, 377 F. Supp. 2d at 67 (citing 20 U.S.C. § 1415(i)(2)(B)).

2.    Private Placement

Under the IDEA, parents who unilaterally decide to place their disabled child in a private school, without obtaining the consent of local school officials, "do so at their own risk." *Florence County Sch. Dist. Four v. Carter*, 510 U.S. 7, 15, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993) (quoting *Burlington Sch. Comm. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 372, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985)).  Parents may only receive tuition reimbursement if a court concludes that (1) "the public school placement violated the IDEA" *and* (2) "the private school

14

placement was proper under the Act." *Id.* at 15, 114 S.Ct. 361.  Importantly, the first factor is a threshold question: if the public school placement would have been appropriate, the court's analysis ends, and a disabled child's parents are not entitled to reimbursement.  20 U.S.C. § 1412(a)(10)(C)(I) (indicating that the IDEA "does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made [FAPE] available to the child and parents elected to place the child in such private school or facility"); *M.C. v. Voluntown Bd. Of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000) ("Only if a court determines that a challenged IEP was inadequate should it proceed to the second question."); *T.R. v. Kingwood Township Bd. Of Educ.*, 205 F.3d 572, 582 (3d Cir. 2000) ("The threshold question here focuses on the first prong–viz., whether the Board's proposed placement violated the IDEA. . . . The parental reimbursement mandate comes into play only if we answer yes to this initial question.").

Moreover, even when a court finds that parents of a disabled child eligible for tuition reimbursement under *Carter*, 510 U.S. at 15, 114 S.Ct. 361, amendments made to the IDEA in 1997 allow a court to reduce or deny reimbursement under certain circumstances.  *See* 20 U.S.C. § 1412(a)(10)(C)(iii); *Ms. M. v. Portland Sch. Comm.*, 360 F.3d 267, 271 (1st Cir. 2004) ("In 1997, Congress significantly amended IDEA and, in the process, clarified the circumstances in which parents who unilaterally remove their children from private school may receive tuition reimbursement.") (citing Pub. L. No. 105-17, 111 Stat. 37 (1997)).  A court may reduce or deny tuition reimbursement if, *inter alia*, a disabled child's parents, prior to or during the most recent IEP meeting before removing their child from school, failed to "inform the IEP team that they were rejecting the placement proposed by the public agency to provide a [FAPE] to the child

including stating their concerns and their intent to enroll their child in a private school at public

expense . . . ." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(aa).  A court may also reduce or deny tuition

reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the

parents." *Id.* § 1412(a)(10)(C)(iii)(IIII).

### III: DISCUSSION

Plaintiffs move for summary judgment on the grounds that the Hearing Officer failed to

properly allocate the burden of proof, ignored relevant evidence regarding A.I.'s IEP, and failed

to address the legal and factual issues in the case.  Pls.' Summ. J. at 15–16.  Defendants dispute

these allegations and move for summary judgment on the grounds that the Hearing Officer's

determinations that (1) DCPS provided A.I. with a FAPE and (2) that an adequate IEP had been

developed were reasonable.

In reviewing an administrative determination under the IDEA, the Court must address

two questions that are aimed at the DCPS's paralleling responsibilities to comply with the

procedural and substantive requirements of the IDEA:

> First, has the State complied with the procedures set forth in the Act?  And
> second, is the individualized educational program developed through the Act's
> procedures reasonably calculated to enable the child to receive educational
> benefits?  If these requirements are met, the State has complied with the
> obligations imposed by Congress and the courts can require no more.

*Petersen v. Hastings Pub. Schs.*, 31 F.3d 705, 707 (8th Cir. 1994).  Accordingly, the Court must

analyze: (1) whether the IEP designed for A.I. was procedurally and substantively deficient, and

(2) whether, given the contours of A.I.'s IEP, was A.I. receiving sufficient educational benefits to

meet the requirements of a FAPE.  Because this Court finds that the evidence provided by

Defendants was sufficient to establish that A.I. received meaningful educational benefit despite

some procedural deficiencies with the actual IEP itself, Defendants' Motion for Summary

Judgment is granted and Plaintiffs' Motion for Summary Judgment is denied.

     *A.*      *The Alleged Procedural and Factual Deficiencies in the IEP*

     Plaintiffs allege roughly six deficiencies in A.I.'s IEP, each of which stem from the

testimony of Dr. Laura Solomon offered at the April 2, 2004 hearing before the Hearing Officer.

Pls.' Summ. J. at 9; 4/2/2004 Tr. at 96 (beginning of Dr. Solomon's Testimony), 121–33

(testimony of Dr. Solomon describing how the IEP is deficient in her opinion), 169 (end of Dr.

Solomon's testimony).   The alleged deficiencies are:

1. The IEP did not include a description of A.I.s' present level of performance in the classroom.

2. The IEP did not identify goals and objectives appropriate for A.I.'s skill level.

3. The IEP failed to include those goals from A.I.'s *previous* IEP that she had failed to master.

4. The IEP failed to include an implementation strategy to insure A.I. met the goals and objectives set forth.

5. The IEP did not address A.I.'s fine or gross motor skills.

6. The IEP did not provide A.I. with any classroom modifications.

*Id.* at 9.  According to Plaintiffs, "DCPS has never offered any testimonial or written evidence to

address or refute *any* of these deficiencies.  The law on this point is clear: under the IDEA,

placement is to be based on the IEP."  Pls.'Opp'n at 4.  Plaintiffs stress "[i]f the IEP is

[in]appropriate [sic], the placement is *defacto* inappropriate."  *Id.*  In response to Plaintiffs'

assertion of procedural deficiencies, Defendants essentially concede the existence of some

deficiencies.  *See* Defs.' Reply at 8.  However, Defendants assert that "[i]nstances of minor

nonconformance with an IEP does not negate a placement." *Id.*

The Supreme Court has long recognized that the adequacy of an IEP is to be judged by whether the procedural requirements of the IDEA have been satisfied.  In relevant part, the Court stated:

> When the elaborate and highly specific safeguards embodied in § 1415 are contrasted with the general and somewhat imprecise substantive admonitions contained in the Act, we think that the importance Congress attached to these procedural safeguards cannot be gainsaid.  It seems to us no exaggeration to say that Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, *see, e.g.*, § § 1415(a)-(d), as it did upon the measurement of the resulting IEP against a substantive standard.

*Rowley*, 458 U.S. at 205-06, 102 S.Ct. 3034.  Given the importance of the IDEA's procedural safeguards, it should be of no surprise that when a school district or other state agency violates "the procedural requirements of the Act by failing to develop an IEP in the manner specified, the purposes of the Act are not served, and the district may have failed to provide a FAPE." *W.G. v. Bd. of Trustees of Target Range Sch. Dist.*, 960 F.2d 1479, 1485 (9th Cir. 1992) ("*Target Range*").

However, contrary to Plaintiffs' assertion, not every technical violation of the procedural prerequisites of an IEP will invalidate its legitimacy.  *See Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001) ("Not every procedural violation, however, is sufficient to support a finding that the child in question was denied a FAPE.").  While "[c]ourts must strictly scrutinize IEPs to ensure their procedural integrity," *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 994 (1st Cir. 1990) (citing *Doe By and Through Doe v. Defendant I*, 898 F.2d 1186, 1190 (6th Cir. 1990)), such "strictness . . . must be tempered by considerations of fairness and

practicality," *id.*  As such, courts have consistently held that "[t]echnical violations, for example,

'will not render an IEP invalid.'" *Amanda J.*, 267 F.3d at 892 (quoting *Burilovich v. Bd. of Educ.*,

208 F.3d 560, 566 (6th Cir. 2000), *cert. denied*, 531 U.S. 957, 121 S.Ct. 380, 148 L.Ed.2d 293

(2000)); *see also Defendant I*, 898 F.2d at 1190-91 (procedural safeguards emphasized by

*Rowley* pertain to the process by which the IEP is produced, "rather than the myriad of technical

items that must be included in the written document").  On the other hand, procedural

inadequacies that (1) "result in the loss of educational opportunity," *Target Range*, 960 F.2d at

1484; or (2) seriously infringe upon the parents' opportunity to participate in the IEP formulation

process, *Roland M.*, 910 F.2d at 994; *Hall by Hall v. Vance County Bd. of Educ.*, 774 F.2d 629,

635 (4th Cir. 1985); *Target Range*, 960 F.2d at 1484; or (3) that "caused a deprivation of

educational benefits," *Roland M.*, 910 F.2d at 994, clearly result in the denial of a FAPE.  *See*

*also Amanda J.*, 267 F.3d at 892; *Indep. Sch. Dist. Number 283 v. S.D.*, 88 F.3d 556, 562 (8th

Cir. 1996); *Doe v. Ala. State Dep't of Educ.*, 915 F.2d 651, 662 (11th Cir. 1990).

     Upon an analysis of the six alleged procedural deficiencies in the IEP developed at

Janney for A.I., the Court concludes that the deficiencies constitute "technical" violations of the

IDEA and – by themselves – are not sufficient to have rendered the IEP inappropriate and

ensured the denial of a FAPE.  Several important considerations lead to this finding.  <u>First,</u>

Plaintiffs overstate some of the alleged procedural deficiencies.  For instance, while Plaintiffs

claim that the March 18, 2003 IEP developed at Janney for A.I. "did not include any description

of [A.I.'s] present levels of performance in the classroom," Pls.' Summ. J. at 9, a review of the

IEP does indicate a detailed description of A.I.'s performance, at least in certain areas.  *See, e.g.*,

R. at 147 (listing under "Present Educational Performance Levels in Areas Affected by the

Disability," A.I.'s strengths in math and reading, the impact of her disability in both areas, and test scores in both areas). Again, while Plaintiffs claim that the IEP "failed to identify goals and objectives appropriate for [A.I.'s] skill level," Pls.' Summ. J. at 9, the IEP developed for A.I. actually contains six pages of twenty-six (26) specific "short-term objectives" to be evaluated quarterly and six (6) annual goals. *See* R. at 148-54. While Plaintiffs might object to the appropriateness or adequacy of some of these goals and objectives, their claim that the IEP procedurally "failed to identify goals and objectives" is simply contradicted by the record.

Second, to the extent that Plaintiffs are accurate in asserting that the DCPS failed to follow the laundry list of specifics identified by the IDEA, "technical defects are not sufficient to render the IEP inappropriate if the parents and district are aware of the relevant information." *Chuhran v. Walled Lake Consol. Schs.*, 839 F. Supp. 465, 471 (E.D. Mich. 1993); *Indep. Sch. Dist. No. 283, St. Louis Park v. S.D.*, Civ. No. 3-93-662, 1995 WL 875463, at *12 (D. Minn. Mar. 13, 1995) (same). While Plaintiffs stress that "the Hearing Officer did not address the substantive and procedural deficiencies in the . . . IEP, and the school system has not addressed this issue either at the hearing or their opposition in the instant case," once again their claims are contradicted in part by the record. For instance, Plaintiffs claim that the IEP provided "did not address [A.I.'s] fine or gross motor skills," Pls.' Summ. J. at 9, and that the Hearing Officer did not address this deficiency, Pls.' Reply at 5. However, as the Hearing Officer noted in the H.O.D.,

> The OT evaluation recommended four accommodations that were not included in [A.I.'s] IEP, one of which was addressed to [A.I.'s] mother. As for the three remaining recommendations, the testimony and exhibits revealed that [A.I.] did have access to visual aids and was provided ample time to complete assigned tasks. Thus, only the recommendation that [A.I.] be provided a pencil grip was

> ignored.  In light of the examiner's overall conclusions that [A.I.] "demonstrates average visual motor skills and very strong visual perceptual skills" and did not require OT services, the MDT's failure to prescribe the pencil grip does not render the IEP inappropriate or amount to a denial of free appropriate public education.

R. at 104 (H.O.D.) (also noting that one of the two greatest areas of concern to the Hearing Officer was the MDT's "failure to prescribe the accommodations recommended in the OT evaluation").  As such, based on the record, it is clear that the DCPS did address A.I.'s fine or motor skills, and provided some of the recommended solutions.  Moreover, the Hearing Officer, when making his decision, was certainly informed of these facts, and testimony on this issue was provided.  Accordingly, it is clear that while some information might have been left out of A.I.'s formal IEP, the Iapaluccis and the DCPS were aware of this information and collectively incorporated it into A.I.'s program.  Given the awareness of the relevant information, the technical violation of the IEP does not necessarily render inappropriate the IEP provided to A.I.  *See Defendant I*, 898 F.2d at 1191 ("We underscore the fact that the information absent from the IEP was nonetheless known to all the parties.").

Third, as the Sixth Circuit has emphasized, "[a]dequate parental involvement and participation in formulating an IEP, not adherence to the laundry list of items given in [S]ection 1401(9), appear to be the [*Rowley*] Court's primary concern in requiring that procedures be strictly followed."  *Id.* (citing *Rowley*, 458 U.S. at 205-06, 102 S.Ct. 3034).  The Supreme Court reiterated this emphasis on parental involvement in *Burlington School Committee*:

> Congress incorporated an elaborate set of what it labeled "procedural safeguards" to insure the full participation of the parents and proper resolution of substantive disagreements.  Section 1415(b) entitles the parents "to examine all relevant records with respect to the identification, evaluation, and educational placement of the child," to obtain an independent educational evaluation of the child, to notice of any decision to initiate or change the identification, evaluation, or educational placement of the child, and to present complaints with respect to any of the above. The parents are further entitled to "an impartial due process hearing" . . . to resolve their complaints.

*Burlington Sch. Comm.*, 471 U.S. at 368-69, 105 S.Ct. 1996; *see also id.* at 368, 105 S.Ct. 1996

(noting that the "Act emphasizes the participation of the parents in developing the child's

educational program and assessing its effectiveness").  In this case, Plaintiffs have presented no

evidence – nor have they argued – that Defendants failed to ensure adequate parental

involvement in the creation of the IEP for A.I.  While Plaintiffs may disagree with the end result

and may feel that certain evidence was overlooked, they do not argue that they were denied the

opportunity to examine relevant records, present complaints, or obtain an independent evaluation

of A.I.; moreover, they do not argue that the DCPS somehow failed to provide the proper notice

of relevant events and decisions.   As such, based on this record it appears as though Defendants

ensured adequate parental involvement – the key procedural safeguard as identified by the

Supreme Court.  Moreover, there is no evidence that Defendants, in failing to meet all of the

laundry list of requirements, somehow were guilty of the kind of "procedural bad faith" that other

courts have considered determinative.  *See Town of Burlington v. Dep't of Educ. of Mass.*, 736

F.2d 773, 783 (1st Cir. 1984) ("*Burlington II*"); *see also Roland M.*, 910 F.2d at 995 (noting that

"the lack of any indication of 'procedural bad faith'" on the school's part was a consideration in

the determination that the school "fulfilled the essence of its procedural responsibilities").

Ultimately, given the fact that (1) Plaintiffs overstate the scope of the alleged procedural deficiencies in the IEP, (2) the remaining deficiencies were essentially "technical" and known to the parties during the evaluation and determination process, (3) Defendants clearly ensured adequate parental involvement, and (4) no "procedural bad faith" took place, the Court concludes that to the extent that the IEP provided by Janney to A.I. failed to meet all of the laundry list of procedural requirements outlined in the IDEA, such deficiencies are insufficient to invalidate the IEP and compel a conclusion that A.I. was denied a FAPE. As such, the Court shall shift from a consideration of the alleged procedural deficiencies to an examination of both the substance of the IEP provided to A.I. and the conclusions reached by the Hearing Officer in the H.O.D.

     B.     *Defendants Carried Their Burden of Proving at the Hearing that A.I.'s IEP Was Adequate and that She Was Receiving a FAPE.*

Plaintiffs' Complaint hinges on whether the Defendants carried their burden at the hearing. The District of Columbia regulations that apply IDEA to the District mandate that the DCPS, as the local education agency ("LEA") under D.C. Mun. Regs. tit. 5, § 3001, carries the burden of proving "based solely upon the evidence and testimony presented at the hearing, that the action or proposed placement is adequate to meet the educational needs of the student." D.C. Mun. Regs. tit. 5, § 3030.3. In addition, as stated above, Plaintiffs in this case, as the party challenging the Hearing Officer's determination, carry the burden of persuading this Court that the Hearing Officer was wrong in making his determination. *Kerkam I*, 862 F.2d at 887.

The Plaintiffs focus almost exclusively on the substantive deficiencies in the 2002-2003 IEP in order to show that the proposed IEP developed by the DCPS for the 2003-2004 school year is inadequate, because the DCPS made no major changes to the 2002–2003 IEP for the

2003-2004 school year.  Pls.' Summ. J. at 5, 9; 4/2/2004 Tr. at 121-40, 154-60 (testimony of Dr.

Laura Solomon, a private consultant, qualified to give expert opinion testimony, hired by the

Iapaluccis to review and make recommendations on the March 2003 IEP opining that the 2002-

2003 IEP was inadequate); R. at 147 (referred to in the transcripts as DCPS-1).  Plaintiffs argue

that the testimony produced at the hearing by Defendants supporting the IEP amounted to

nothing more than "self-serving, conclusory statements regarding A.I.'s progress at Janney . . .

[and] DCPS simply failed to address any of the procedural or factual deficiencies contained in

the IEP."  Pls.' Summ. J. at 20.  The Plaintiffs also allege that Hearing Officer Banks ignored

these issues and focused solely on whether A.I. was making progress.  Pls.' Summ. J. at 13.

Importantly, while the Hearing Officer must make his determination based on the

testimony at the hearing, he is also required to examine all of the evidence presented, including

the evidence presented in the written administrative record.  *Kerkam I*, 862 F.2d at 887.  While

the testimony provided at the hearing by Defendants' witnesses focused largely on A.I.'s

progress, the evidence in the record supported the Hearing Officer's finding that the Defendants

met their burden in disproving the alleged substantive deficiencies of the IEP.  As such, and as

detailed below, the Court concludes that the Hearing Officer's conclusion that A.I. had evinced

meaningful educational progress during the two month IEP period at Janney was grounded upon

reasoned findings clearly supported by the record.

The standard set out by the Supreme Court in determining whether a child is receiving a

FAPE, or the "basic floor of opportunity," is whether the child has "access to specialized

instruction and related services which are individually designed to provide educational benefit to

the handicapped child."  *Rowley*, 458 U.S. at 201, 102 S.Ct. 3034.  The IDEA, according to

*Rowley*, imposes "no additional requirement that the services so provided be sufficient to *maximize* each child's potential commensurate with the opportunity provided other children." *Id.* at 198, 102 S.Ct. 3034 (emphasis added); *see also Kerkam I*, 862 F.2d at 886 (emphasizing that *Rowley* rejected "[i]n at least four places" the notion that a public school placement must "maximize the potential of handicapped children"). Furthermore, if a public school placement is appropriate, a school district need not consider a private placement, "even though a private school might be more appropriate or better able to service the child." *Jenkins v. Squillacote*, 935 F.2d 303, 305 (D.C. Cir. 1991). Rather, the analysis of the appropriateness of a public school placement "is not comparative." *Id.*

It is therefore highly relevant whether A.I. was making progress and experiencing meaningful educational benefit from the IEP established and implemented at Janney. It is uncontested that A.I. is benefitting from her placement at Kingsbury, and that Kingsbury "is a better fit for [A.I.] than Janney," R. at 105 (H.O.D.). However, a court must not focus on whether the DCPS is maximizing A.I.'s potential through its proposed placement of A.I. at Janney under the terms of the IEP; rather, the appropriate focus of the court's review should be on whether DCPS is providing A.I. with an IEP that is reasonably calculated to produce meaningful educational benefit. *See Rowley*, 458 U.S. at 199, 102 S.Ct. 3034; *see also M.C. v. Cent. Regional Sch. Dist.*, 81 F.3d 389, 393 (3d Cir. 1996) (noting that "*de minimis* benefits" are insufficient to satisfy *Rowley*'s "some educational benefit"). Furthermore, it is irrelevant and improper for this Court to engage in a comparison of how A.I. progressed at Kingsbury versus her progress at Janney. The question is whether the 2003-2004 IEP was appropriate and whether Janney could implement the IEP in order to provide A.I. with a FAPE. *See Angevine v. Smith*,

959 F.2d 292, 295-96 (D.C. Cir. 1992) (finding that the district court reversed the decision of the Hearing Officer based largely on an impermissible comparison of the child's experiences at the public versus the private schools).

The Hearing Officer heard testimony from A.I.'s teachers that while she did not master the goals of her IEP during the relatively short period of time between the issuance of the IEP and the Iapaluccis decision to remove A.I. from Janney, she did make noticeable progress between March 2003 (when the IEP was implemented) and the end of that school year roughly two months later.  R. at 103 (H.O.D.); 12/12/2003 Tr. at 64-65 (testimony of Ms. Laura Estomin, one of A.I.'s teachers, explaining anecdotally how A.I.'s reading, writing, and math improved after the implementation of the IEP); R. at 159-61 (A.I.'s IEP Report Cards, indicating progress); R. at 162-67 (A.I.'s Related Services Progress Reports dealing with speech and language, noting "continued improvement" and a good "prognosis" for future improvement).  Upon a review of both the written record and oral testimony, the Hearing Officer concluded that as a result of the IEP, A.I.

> made progress on her speech and language skills throughout the 2002-2003 school year.  She mastered none of her IEP goals, but she generally made progress on all of them.  She improved from being overwhelmed by being asked to summarize a chapter in a book to being able to do things on her own, including writing on her own.  Her comfort level doing math also increased over the year, and "things came a lot faster and easier towards the end of the year."

R. at 103 (H.O.D.) (quoting testimony of Ms. Estomin).

Plaintiffs now attack the testimony offered at the hearing by A.I.'s teachers at Janney, contending that "DCPS witnesses were unable to point to any quantitative data demonstrating [A.I.'s] progress [during the 2002-2003 school year]."  Pls.' Facts ¶ 50.  While it is true that the

vast majority of evidence presented at the hearing and relied on by the Hearing Officer was

anecdotal, the Hearing Officer based his analysis regarding A.I.'s progress in part on four

detailed progress reports crafted during A.I.'s 2002-2003 school year at Janney.  The Hearing

Officer specifically mentioned that A.I.'s "fourth quarter progress report provided a thorough

analysis of the progress she had made during the year toward meeting her IEP goals."  R. At 104

(H.O.D.).  While a review of A.I.'s "Elementary Report Card – Progress Toward IEP Goals"

does reveal a lack of reference to specific test score or grade advances by A.I., these reports

certainly contain a myriad of specifics that substantiate the Hearing Officer's finding of progress.

For instance, these "report cards" note, *inter alia*, that A.I. now (1) is able to solve word

problems, (2) can add and subtract with and without regrouping, (3) is able to use a

multiplication table, (4) is starting to memorize her multiplication tables, (5) can tell time, (6)

can identify the main idea of a chapter, (7) can verbalize events in a chapter, and set them out in

paragraph form, (8) edit her own work, and (9) has begun working with geometry.  R. at 155-56.

        In addition to the detailed testimony and specific written evidence provided by the DCPS,

indicating A.I.'s academic progress during the 2002-2003 school year, the Hearing Officer was

also provided significant testimony detailing the opinion of A.I.'s teachers and the IEP team that

A.I.'s spoken language skills and her language recognition would benefit from interaction with

children who were not disabled and were able to talk to her on age-appropriate topics.

12/12/2003 Tr. at 67 (testimony of Ms. Estomin regarding whether A.I. benefitted from being in

a classroom with non-disabled children); R. at 204 (6/11/2003 IEP/MDT Meeting Minutes).  The

Hearing Officer was presented with evidence by the DCPS indicating progress in this area as

well, as A.I.'s fourth quarter progress report noted that, "[s]he has many friends in the classroom,

and she seems to really enjoy her time at school."  R. at 104 (H.O.D.).

Importantly, it is not necessary that all benefits fall under the strict category of "academic benefit."  The decision by the D.C. Circuit in *Dawkins v. District of Columbia* is instructive on this matter.  In *Dawkins*, the D.C. Circuit stated that the vocational program that DCPS identified as the appropriate placement for the child was not rendered inappropriate simply because it did not constitute an "academic type program"; rather, the *Dawkins* court emphasized that the IEP was appropriate because it was "reasonably calculated to confer educational benefit," and noted that the fact that there may have been a better placement does not render inadequate the current placement.  *Dawkins v. Dist. of Columbia*, 872 F.2d 496 (D.C. Cir. 1989) (table), 1989 U.S. App. LEXIS 5463, at *6–7 (D.C. Cir. Apr. 29, 1989) (per curium).  The testimony of Ms. Estomin that A.I. was benefitting from interacting with non-disabled children is relevant to whether A.I. was receiving educational benefit from the placement at Janney.  As such, the Hearing Officer's consideration of this testimony, and his use of this evidence in making his ultimate determination, was certainly supportable and within his discretion in analyzing the relevant IEP.

In response, Plaintiffs contend that Hearing Officer Banks disregarded the evidence presented by Plaintiffs' that contradicts that presented by the Defendants.  Plaintiffs' contention is undermined by three important facts.  First, the Hearing Officer's H.O.D. was often quite explicit in recognizing possible contradictions.  For instance, while noting that "DCPS offered credible testimony from Ms. Wood and Ms. Estomin that [A.I.] was receiving educational benefit at Janney" and gaining social acceptance, he also specifically indicated that A.I.'s "mother refuted the purported progress, testifying that [A.I.] had to spend an inordinate amount of time on homework, was confused, and was socially unaccepted."  R. at 104 (H.O.D.).  The Hearing

Officer did consider this disparity "significant," and although he ultimately credited the testimony of Ms. Estomin and the analysis in A.I.'s progress reports on this issue, he did credit the testimony of A.I.'s mother to the extent that she found that "Kingsbury was a better fit for [A.I.] than Janney."  R. at 105 (H.O.D.).  Moreover, the Hearing Officer also emphasized that "[t]he two issues of greatest concern to the hearing officer were the MDT's failure to adopt the recommendations of Dr. Panero [sic][6] and Ms. Washington to place [A.I.] in a self-contained setting, and its failure to prescribe the accommodations recommended in the OT evaluation."  R. at 104 (H.O.D.).  While he certainly did not find for Plaintiffs on all issues, a review of the H.O.D. indicates that he did not "disregard" much of their evidence.

Second, Hearing Officer Banks was the trier of fact at the due process hearing.  As such, it was his responsibility to determine how much weight to give the evidence.  Upon a review, it is impossible to support the assertion that Hearing Officer Banks "ignored" the testimony of Plaintiffs' witnesses.  It is just as likely that Hearing Officer Banks relied heavily upon the testimony of the DCPS witnesses because those witnesses worked everyday with A.I. throughout the three-month implementation of the 2002-2003 IEP and would be in the best position to gauge her performance and determine whether the goals of the 2003-2004 IEP were appropriate.  *See* R. at 104 (H.O.D.) (noting that the teachers involved "offered credible testimony").  Indeed, the H.O.D. is replete with references by the Hearing Officer to the evidence offered by Plaintiffs.  For instance, the Hearing Officer specifically noted that one of the two areas of "greatest concern" for him was the MDT's "failure to adopt the recommendations of Dr. Panero [sic] and

---

[6] The Hearing Officer, in the H.O.D., consistently misspells Dr. Papero's name "Panero." *See* R. at 104 (H.O.D.).

Ms. Washington to place Petitioner in a self-contained setting." R. at 104 (H.O.D.). The

Hearing Officer correctly emphasized that Dr. Papero clearly favored a self-contained classroom

model, as Plaintiffs requested; while considering that evidence, the Hearing Officer also weighed

the social benefits of mainstream placement, with a high level of daily supports – an option

supported by the MDT and identified by Dr. Papero as having certain "relative benefits." R. at

104 (H.O.D.). In this area, the Hearing Officer clearly considered Plaintiffs' evidence, but

rejected some of their conclusions, finding "[i]n light of the progress reported by Ms. Estomin

throughout the school year, the MDT's decision to place [A.I.] in a lesser restrictive environment

was reasonable." R. at 104 (H.O.D.).

Third, Plaintiffs provide no legal support for the assertion that Hearing Officer Banks had

to offer a detailed explanation for why he gave more weight to Defendants' evidence than to

Plaintiffs' evidence. A similar argument was made by the plaintiffs in *Schoenbach v. District of

Columbia*, 309 F. Supp. 2d 71 (D.D.C. 2004), and was rejected. The *Schoenbach* court noted

that the Hearing Officer was entitled to make such decisions regarding the weight to give

witnesses in order to come to a conclusion. *Id.* at 79. There are strong policy considerations for

providing the Hearing Officer such leeway; as the Hearing Officer – as opposed to this Court –

has an opportunity to hear testimony in person, examine the demeanor of the witness and

reactions of the participants, and can bring immeasurable experience and expertise in this

specialized area. "[T]he Hearing Officer was utilizing his knowledge and experience such that

judicial deference to his expertise is especially appropriate." *Block v. Dist. of Columbia*, 748 F.

Supp. 891, 896 (D.D.C. 1990).

Importantly, this "Court may reverse the Hearing Officer's decision only if the Court – giving his decision due weight – is nevertheless satisfied that [Plaintiffs] ha[ve] shown by a preponderance of the evidence that he was wrong." *Id.* at 895. "[W]hile *de novo* review is inappropriate, a court's authority is not so limited that it must accord the hearing officer deference as great as the 'clearly erroneous,' 'abuse of discretion,' or 'substantial evidence' standards of review. . . . In short, the standard of review is somewhere in the middle. . . ." *Id.* at 895 (citation omitted). Upon an analysis of the H.O.D. as set forth above, the Court concludes that Plaintiffs have not shown, by a preponderance of the evidence, that the Hearing Officer's conclusion that A.I. experienced progress at Janney as a result of her IEP was incorrect. The Court finds that the Hearing Officer clearly identified certain areas of progress, set forth his reasons for concluding that meaningful educational progress had occurred, and had sufficient evidence in the record upon which to make such conclusions. The H.O.D. also indicates that the Hearing Officer considered evidence contrary to his conclusions, and carefully balanced the evidence presented before him. As such, the Court finds that Plaintiffs' assertion that the Hearing Officer improperly concluded that meaningful educational progress had occurred is without merit. While the Court certainly sympathizes with the conscientious efforts of the Iapaluccis to obtain the best possible education and services for their daughter, this is simply a case in which the DCPS met the statutory thresholds provided for in the IDEA.[7]

---

[7] Given this conclusion, the Court need not reach Defendants' argument that the Iapalucci's alleged failure to cooperate with the DCPS and alleged failure to provide notice regarding their concerns and their intention to move A.I. to a private school waived any right they may have possessed to tuition reimbursement.

## IV: CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.  The Court finds that Plaintiffs are not entitled to any reimbursement of costs incurred while A.I. has been at Kingsbury and are not entitled to attorney's fees.  An Order accompanies this Memorandum Opinion.


Date:   September 19, 2005


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge